## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DeVries Dairy, LLC,                                                 Case No. 3:09CV207

               Plaintiff

     v.                                                                  **ORDER**

 White Eagle Cooperative Association,

             Defendant


This case arises out of a dairy cooperative contract. Plaintiff/counterclaim defendant, DeVries Dairy (DeVries), operates a commercial dairy farm in Marion County, Ohio. DeVries was a member of defendant/counter-claim plaintiff White Eagle Cooperative (White Eagle or Co-op), an Indiana agricultural association. White Eagle markets milk for its dairy farmer members in the Midwest.

Jurisdiction exists pursuant to 28 U.S.C. § 1332.

After the parties filed counter-motions for summary judgment, [Docs. 28, 30], I referred this case to Magistrate Judge Vernelis K. Armstrong. The Magistrate Judge filed a Report and Recommendation (Report) [Doc. 62] recommending that I grant White Eagle's motion for summary judgment and grant DeVries' motion for summary judgment on White Eagle's counterclaims.

DeVries objected to the Magistrate's Report. [Doc. 66].

## Background

Before joining White Eagle, DeVries shipped milk as a non-member patron of Alto Dairy Cooperative. On October 9, 2003, DeVries became a member of White Eagle. It remained a member of White Eagle until April 30, 2008.

Under the terms of the Co-op membership agreement, White Eagle was the exclusive agent for marketing and selling all milk DeVries and the other dairy farm members of the Co-op produced. White Eagle commingled the proceeds from the sale of all its members' milk. White Eagle then distributed the proceeds under a distribution model designed to equalize the payments to individual producers, conform the payments to the federal marketing order minimum price and reflect the aggregate effect of the Co-op's marketing efforts.

White Eagle hired T.C. Jacoby & Co. (Jacoby) as a marketing agent to sell its members' milk. Jacoby had previously served as marketing agent for the individual dairy-farmer incorporators.

Jacoby contracted with Knox Services, Inc. (Knox) to perform field services for the Co-op's benefit. Ron Brechler, the principal of Knox, was responsible for direct day-to-day contact with the Co-op's dairy farm members.

In 2007 and early 2008, White Eagle reduced the premiums paid to DeVries, allegedly because DeVries refused to stop using the bovine hormone rBST.[1] DeVries sent notice that it was ending its contract with White Eagle on March 28, 2008, effective April 30, 2008.

---

[1] Kroger Company, the Co-op's largest customer, had notified White Eagle that it would no longer accept milk from cows ingesting rBST. Despite Jacoby's urging, DeVries and a small number of other Co-op members continued using the hormone, which increased production from their herds.

2

DeVries asserts five claims against White Eagle: 1) breach of contract; 2) breach of good faith and fair dealing; 3) negligent misrepresentation; 4) tortious acts in concert; and 5) conversion. White Eagle seeks summary judgment with respect to each of those claims.

White Eagle asserts counter-claims against DeVries: 1) breach of fiduciary duty; 2) breach of good faith and fair dealing; and 3) tortious interference with a business relationship.

White Eagle asserts four affirmative defenses against DeVries: 1) waiver; 2) the terms of the agricultural cooperative marketing agreement; 3) failure to mitigate damages; and 4) set-off. The parties agreed to dismiss the set-off claim. DeVries seeks summary judgment on the remaining three defenses.

## Standard of Review

I review the Magistrate's decisions as to dispositive motions, such as a motion for summary judgment, *de novo*. 28 U.S.C. § 636(b)(1)(A); *United States v. Raddatz*, 447 U.S. 667, 674 (1980).

In a diversity contract case I apply substantive state law under the doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). *E.g., Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir.2000). But Rule 56 of the Federal Rules of Civil Procedure sets the standard for determining whether I should grant summary judgment. *E.g., Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 459 (6th Cir.1986).

The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and

3

present some type of concrete evidentiary material in support of its position. *Celotex, supra*, 477 U.S. at 324.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the non-moving party, all evidence will be construed in the light most favorable to the non-moving party, and all inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to challenge the judgment as a matter of law. *Celotex, supra*, 477 U.S. at 323.

The standard of review for cross-motions for summary judgment does not differ from the standard when one party files such a motion. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). "[T]hat both parties have moved for summary judgment does not mean that the court must grant summary judgment as a matter of law for one side or the other." *Morr v. Kamco Indus., Inc.*, 548 F.Supp.2d 472, 477 (N.D.Ohio 2008).

In a contract dispute, summary judgment is permissible when the contractual language is unambiguous, or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits contract interpretation of the agreement as a matter of law. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

4

### Discussion

### I. DeVries Dairy's Claims

### A. Breach of Contract[2]

DeVries alleges that White Eagle breached their contract by failing to: 1) pay DeVries a fair and equitable premium; 2) pay DeVries a monthly premium of $0.75 per hundredweight ($0.75/cwt) of milk; and 3) give DeVries thirty days' advance notice before changing the premium.

### 1. Fair and Equitable Premiums

DeVries asserts the Magistrate Judge erred by failing to consider whether premiums White Eagle paid complied with the terms of White Eagle's bylaws, which required the premiums be determined in a fair and equitable manner.[3]

Under Article 15 of the bylaws, "Whenever it can be done under applicable laws, orders, rules or regulations, or whenever the board shall determine that market conditions warrant, the Association may repool the proceeds of the sales of member milk in such manner as will be fair and equitable to all members." [Doc. 29 at 30].

DeVries argues that a genuine issue of material fact exists with respect to whether the premiums were fair and equitable.

---

[2] The Magistrate Judge found that DeVries waived its rights to contest the premiums—a finding to which DeVries objects—and therefore did not reach the merits of White Eagle's motion for summary judgment. As discussed *infra*, I find that a genuine issue of material fact exists with respect to whether DeVries waived and if so, the scope of that waiver.

[3] DeVries argues that even if it is found to have waived its right to contest the premium changes such a waiver would not encompass its right to a fair and equitable premium. The bylaws, which required the premiums be fair and equitable, were, by DeVries' own assertion, incorporated into the DeVries-White Eagle contract. If the finder of fact determines that DeVries waived its rights under the contract to contest the premium changes, its waiver naturally encompasses the contractual obligation to determine the premiums in a fair and equitable manner.

### a. 2007 Premiums

With respect to whether the 2007 premiums DeVries received were fair and equitable, I find that no genuine issue of material fact exists. The entirety of DeVries' evidence relates to the drastic reduction in premiums in 2008 following Kroger's declination of further deliveries of rBST milk. The White Eagle bylaws authorize the cooperative to repool, for distribution to members as the board may deem fair, pooled revenues it has received under milk order rules.

Other than its assertion that it was due a premium of $0.75/cwt, DeVries presents no evidence that the premiums it actually received in 2007 were unfair or inequitable. Instead, the evidence shows that other members received similar premiums during that period.[4]

DeVries' claim that White Eagle breached the contract between them by violating the bylaws' fair and equitable premium requirement in 2007 is therefore without merit.

Thus, all that remains at issue in this case is whether the 2008 premiums paid to DeVries before it left the Co-op on April 30th conformed to the agreement between the parties.

### b. 2008 Premiums

White Eagle's purported reason for paying DeVries negative premiums in 2008 was DeVries' continued use of rBST and the resulting loss of sales to Kroger. White Eagle asserts that

---

[4] DeVries' own exhibit suggests that it received the third-highest premium paid to any member of the Co-op during December 2007, for example. [Doc. 57-1 at 4].

Even a discrepancy between premiums paid to members would likely be insufficient, on its own, to raise a genuine issue of material fact because premiums often depend "on a variety of criteria such a milk quality, composition, quantity supplied or services provided. They may also represent market supply/demand conditions not adequately accounted for in the regulated price." [Doc. 28-1 at 6 n.13] (citing the *Glossary of Dairy Marketing Terms* (Cornell Program on Dairy Markets and Policy, January 2000, p. 20).

DeVries' refusal to stop using rBST (including negative plant premiums, reduced Kroger sales, and additional freight) cost the Co-op almost $500,000. [Doc. 56-1 at 11].

After deliveries to Kroger ended on January 18, 2008 and the ensuing revenue shortfall, White Eagle reduced premiums in the first months of 2008. In addition, White Eagle "assessed to DeVries the damages for having to reschedule deliveries to plants at a negative premium." *Id*.[5]

DeVries alleges that White Eagle did not in fact reduce DeVries' premium due to rBST use. As evidence, DeVries asserts that it received lower premiums than other White Eagle producers using rBST.[6] Even after DeVries sent an affidavit certifying that it no longer treated its cows with rBST, other White Eagle producers who actually used rBST received significantly higher premiums for milk marketed during that same period. One member who continued to use rBST, Hatfield Seven Dairy, received the highest premiums of any member of the cooperative. [Doc. 65-1 at 14].

DeVries asserts that Jacoby instructed his staff to allocate additional costs and low value sales to DeVries. Paul Reinhard, White Eagle's witness in charge of calculating the damages, testified that White Eagle assigned DeVries milk a negative premium in 2008 because "that's what I was asked to do." [Doc. 48 at 95-96].[7]

---

[5] According to the DeVries damages chart, the cost of total freight absorbed by the Co-op was "calculated by taking corresponding rates to deliver the plant less rates to deliver to Kroger. Using Kroger as a base point could be a contentious issue as the pounds assessed to Devries exceeded what was typically delivered to Kroger during a months [sic] times." [Doc. 56-1 at 11].

[6] According to White Eagle's damages calculation, seven other members also received negative premiums from January 2008 through May 2008. While five producers each received a premium of – $0.60, White Eagle paid DeVries and one other member - $1.85. All seven producers received premiums of – $1.00 in February, and all but DeVries continued to received that premium through May 2008. DeVries received premiums of – $2.50 in March and April, and – $2.00 in May. [Doc. 56-1 at 11].

[7] DeVries also relies on an one email from a Jacoby employee, in which she states, "Also, I guess there is a problem with the cancellation fee for SMI and we are awaiting a new revised

White Eagle, in its motion for summary judgment, counters that White Eagle's membership agreement and bylaws expressly authorized various payment plans to its members, and vest its board with discretion to distribute milk revenue among the cooperative's members in a manner deemed fair and equitable to all members.

I find that DeVries asserts facts that, if true, suggest that, with respect to the months of March and April 2008, only, the premiums it received were neither fair nor equitable, despite White Eagle's admitted discretion to set premiums.

The premium White Eagle paid DeVries in January 2008 was identical to that paid to Oolman Dairy, and the premium White Eagle paid DeVries in February was identical to that received by all but one dairy which continued to use rBST. Therefore a comparison of premiums paid to other rBST-using members alone does not give rise to a genuine issue of material fact with respect to whether White Eagle failed to comply with its obligation to distribute revenue in a fair and equitable manner.

However, after DeVries tendered its notice of resignation from the Co-op, Jacoby sought authorization from the board of directors to treat DeVries "as a class of one" and, for the months of March and April, paid DeVries a premium well below that paid to any other member of the cooperative. [Doc. 29 at 79].

Jacoby's letter to the board states that while "other members came around and started to come off of rBST, DeVries did not," and blames DeVries for the loss of the Kroger business. *Id.*

---

billing (since now we will be down another $80,000 or so, so we will be manipulating the premiums again......... Fun!!!)" [Doc. 48 at 4]. This, DeVries argues, suggests that premiums, to producers were not calculated, but rather were "manipulated" when the situation required. Without more, I do not find this email indicative of the sinister meaning that DeVries ascribes to it.

8

Jacoby states that members' premiums would continue to reflect the costs and lose revenues "largely due to DeVries's reticence to listen to our recommendations [of going rBST free]." While other members would bear the "disproportionate share of such costs and lost revenues" for months to come, Jacoby stated that DeVries, by leaving, "will not shoulder his fair share." *Id*.

The premium White Eagle paid DeVries for March and April was far lower than other members who continued to use rBST in their cows, even after DeVries had stopped using the hormone. Therefore, I find that DeVries has presented sufficient evidence to raise a genuine issue of material as to whether during March and April 2008 White Eagle unfairly singled out DeVries to bear the brunt of the Co-op's losses.

## 2. $0.75/cwt Premium

DeVries claims that for milk it marketed through White Eagle from January 2007 through April 2008, it was entitled by contract to receive a premium of $0.75 per hundredweight (/cwt) for its milk.

White Eagle moves for summary judgment on this claim, arguing that no material facts support the existence of a binding agreement between DeVries and White Eagle for payment of the $0.75/cwt premium during each monthly term. I agree.

DeVries asserts it was entitled to the $0.75/cwt monthly premium on the basis of: 1) its marketing and membership agreement with White Eagle; 2) the White Eagle bylaws; 3) the Alto memorandum of August 31, 2003; 4) oral representations made by a White Eagle agent; and 5) its course of dealing with White Eagle.

Neither the White Eagle marketing agreement nor the bylaws gives DeVries the right to the $0.75/cwt premium, and DeVries does not, in its briefs, point to a single phrase in either of those

9

documents that might do so. White Eagle's bylaws provide for pooling of revenues between members in a fair and equitable manner, and to allocate losses among members in the way it deems "to be most equitable and practicable." [Doc. 28-1 at 11].

DeVries' reliance on the Alto Dairy memorandum also fails. Even if the memorandum were found to be binding on White Eagle—which I do not address—DeVries itself acknowledges that "[b]oth Alto Dairy and White Eagle could change premiums," and "[u]nder the initial memorandum from Alto Dairy, Alto was free to adjust premiums as well." [Doc. 35 at 12].

The alleged oral representations of Ron Brechler or other White Eagle representatives did not create a binding obligation on White Eagle.[8] It is well established that extrinsic or parol evidence inconsistent with a written contract may not, as a matter of Ohio law, be considered to interpret the contract or to create an obligation under the contract. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (summarizing Ohio law). As I have found that the written contractual documents unambiguously do not oblige White Eagle to pay a $0.75/cwt premium, inconsistent extrinsic evidence cannot serve to create a genuine issue of material fact.

Finally, DeVries' course of dealing argument is virtually nonexistent in its briefs. DeVries does not provide support for the contention that the parties' course of dealing establishes a contractual arrangement between them. Perhaps this is unsurprising, given that the parties' course

---

[8] DeVries relies on three alleged oral representations: 1) before the parties signed the membership agreement in October 2003, White Eagle promised to maintain premiums and terms of DeVries's prior contract with Alto, including a 30-day advance notice for changes in premiums; 2) in September 2005, when White Eagle lowered DeVries' premium to $0.75/cwt, Ron Brechler promised premiums would stay at that level; 3) in 2007, when Brechler told DeVries its continued use of rBST would not result in lower premiums.

10

of dealing has consisted of eight changes to the monthly premiums during the sixteen months at issue in this case.

White Eagle had the right, under its contract with DeVries, to change the monthly premiums it paid its members. I find that, as a matter of law, White Eagle did not breach its contract with DeVries by failing to pay monthly premium of $0.75/cwt.

### 3. Thirty Day Notice of Premium Changes

DeVries asserts that White Eagle breached the parties' contract by failing to provide thirty-day notice before changing the monthly premiums, as required by the August 31, 2003 Alto Dairy memorandum.[9]

White Eagle moves for summary judgment on this breach of contract claim, arguing that no material facts support the existence of a binding agreement on White Eagle to provide notice.

Neither the White Eagle membership agreement nor the incorporated bylaws require advance notice of premium changes. DeVries therefore advances extrinsic evidence to show that the contract incorporated that requirement, namely: 1) the 2003 pre-contract memorandum from third party Alto Dairy; 2) post-contract correspondence a White Eagle subsidiary sent "in accordance with" the Alto Dairy memorandum;[10] 3) Derek DeVries' deposition testimony asserting that the parties agreed not

---

[9] Before becoming a member of White Eagle, DeVries shipped milk as a non-member patron to Alto Dairy. The 2003 memorandum entitled DeVries to a $1.15/cwt premium for its milk and thirty day notice of any changes to the premium.

[10] On August 31, 2005 a Jacoby subsidiary sent a memorandum informing DeVries that its premium would be lowered in thirty days. The memorandum states that it was sent "[i]n accordance with the agreement entered into by 'Memo' (Alto Dairy Cooperative and Devries) dated August 12, 2003." [Doc. 29 at 59].

11

to change the Alto Dairy milk marketing arrangements as a result of White Eagle's formation; and 4) the course of dealing between the parties.

White Eagle argues that because the written agreement is unambiguous, such extrinsic evidence may not be employed to vary the terms of the agreement. I agree.[11]

Ohio's parol evidence rule prohibits extrinsic evidence from being used to "alter, contradict, contest, or vary an integrated written agreement." *Glazer v. Lehman Bros*., 394 F.3d 444, 455 (6th Cir. 2005) (citing *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27 (2000)).

A contract is integrated if it "embod[ies] the complete terms of an agreement." *Galmish, supra* at 27. Under Ohio law, "[a] contract that appears to be a complete and unambiguous statement of the parties' contractual intent is presumed to be an integrated writing." *Bellman v. Am. Internatl. Group*, 113 Ohio St. 3d 323, 326 (2007) (citing *Fontbank, Inc. v. CompuServe, Inc.*, 138 Ohio App.3d 801, 808 (2000)).

Despite DeVries' assertion that the contractual relationship between the parties includes the Alto Dairy memorandum, the later White Eagle agreement does not mention the incorporation of the antecedent Alto Dairy arrangement. DeVries does not identify language or ambiguity in the membership agreement or bylaws suggesting that the contract was not a complete statement of the parties' intent at the time the statements were made. I presume, therefore, that membership agreement and bylaws constitute a fully integrated document in accordance with the Ohio Supreme Court in *Bellman, supra*.

---

[11] DeVries argues that "At the very least, an issue of material fact exists as to how the memorandum from Dairy Support Inc. modified the relationship between DeVries Dairy and White Eagle, if at all." [Doc. 35 at 12]. However, "whether a contract's terms are ambiguous is a question of law for the court." 18 Oh Jur Contracts § 121.

Having determined that the contract between the parties is fully integrated, the parol evidence rule bars the introduction of extrinsic evidence to contradict the express terms of the written contract. *See, e.g., Williams v. Spitzer Autoworld Canton, L.L.C.*, 122 Ohio St. 3d 546, 550 (2009). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Cal. Fitness I, Inc. v. Lifestyle Family Fitness, Inc.*, 2011 WL 2535285, *8 (6th Cir.) (unpublished disposition) (applying Ohio law).

The membership agreement and bylaws are clear: they do not require thirty day notice of premium changes. Thus, the extrinsic evidence on which DeVries relies is not admissible to create such an obligation. *See, North Shore Neurological Serv., Inc. v. Midwest Neuroscience, Inc.*, 2009 Ohio 2429, ¶28 (Ohio App.) (parol evidence rule forbade plaintiff from contradicting terms of the written contract with evidence that defendant promised to do something not mentioned in the contract).

White Eagle's motion for summary judgment on this breach of contract claim is therefore granted.

### B. Breach of Good Faith and Fair Dealing

DeVries argues that the Magistrate Judge erred by dismissing its claim for breach of the duty of good faith and fair dealing, which the Magistrate Judge characterized as a tort claim. The Magistrate Judge found that DeVries Dairy's breach of contract claim "subsumes the breach of duty of good faith and fair dealing claim." [Doc. 60 at 9].

DeVries acknowledges that Ohio law does not recognize a separate tort for the breach of good faith and fair dealing, but argues that it did not plead its breach of good faith and fair dealing claim as a separate tort. Rather, DeVries alleges that White Eagle's failure to pay the amount due

13

and the unwarranted reductions to the producer premium is a breach of the covenant of good faith and fair dealing.

DeVries correctly states that "Ohio Courts recognize that 'a party may maintain a breach of contract claim when the term allegedly breached is the implied duty of good faith and fair dealing.'" (citing *Eggert Agency Inc. v. NA Mgmt. Corp.*, 2008 WL 3474148, *4 (S.D. Ohio) (reversed on other grounds)). [Doc. 66 at 7].

However, DeVries' breach of good faith and fair dealing claim is pled independently of its substantively identical breach of contract claim.

Here, as in *Eggert*, the plaintiff pled "a straight-forward breach of contract claim" as count one of the complaint and a of breach of good faith claim as count two. *Id.* at *5. The court in *Eggert* concluded that the second count had "no legal foundation to stand" and dismissed it, because "a breach of contract claim subsumes a claim for breach of good faith and fair dealing," *Id.*; *see also Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 108 Ohio App. 3d 637, 646 (1996) (In Ohio, every contract contains an implied covenant of good faith and fair dealing, but "good faith" is part of a contract claim and does not stand alone).

I find that the Magistrate Judge correctly dismissed DeVries' breach of good faith and fair dealing claim.

### C. Negligent Misrepresentation

DeVries claims to have relied on promises by independent contractor Brechler, the liaison between the milk producers and the cooperative. In 2007, Brechler allegedly promised DeVries that lower premiums would be made up at a later date.

14

In its motion for summary judgment, White Eagle argues that DeVries's alleged reliance was unreasonable as a matter of law, and cannot satisfy the elements for negligent misrepresentation in Ohio.

> Under Ohio's distinct claim of negligent misrepresentation, [o]ne who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions ." .  . is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*The Andersons, Inc., v. Consol, Inc.*, 348 F.3d 496, 505 (6th Cir. 2003) (quoting *Delman v. City of Cleveland Heights*, 41 Ohio St.3d 1, 4 (1989)).

Establishing justifiable reliance involves a fact-based inquiry into the circumstances of the case and the relationship between the parties. *Lecrone v. Yates*, 2003 Ohio 1103, *5 (Ohio App.) (citing *Lepera v. Fuson*, 83 Ohio App. 3d 17, 26 (1992)). "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Crown Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657 (1996).

The Magistrate Judge found that DeVries could not satisfy the element of reasonable reliance, because DeVries could not reasonably rely on representations that the price of milk from cows treated with hormones would remain unchanged. Marketplace facts known to DeVries clearly indicated otherwise. After Kroger announced that its milk would be rBST-free as of February 1, 2008, DeVries could not reasonably rely on Brechler's alleged information: a reasonable person could only expect that, due to the loss of a major customer, premiums and levels of service would go down due to an overabundance of milk from cows treated with rBST.

15

DeVries objects, contending that the Magistrate Judge erred by deciding the negligent misrepresentation claim on grounds not argued by either party. Not so: White Eagle's motion for summary judgment asserts that the "DeVries claim [that it relied on Brechler's promise that DeVries' premiums would be unaffected by its continued use of rBST] is not credible in any event, because DeVries knew it could not market rBST milk at any price to other cooperatives." [Doc. 34 at 9].

In any event, this argument fails for want of disputed facts as to the reasonableness of DeVries's purported reliance on representations of no price impact from the loss of the market for rBST milk. During late 2007, DeVries knew from multiple sources that rBST-laden milk could not be sold to several cooperatives and buyers of milk.[Doc. 39 at 8-9].

DeVries is correct that whether reliance vis-a-vis a claim of negligent misrepresentation is reasonable is usually an issue of fact not generally subject to a motion for summary judgment. *See generally Carpenter v. Scherer-Mountain Insurance Agency*, 135 Ohio App. 3d 316, 328 (1999).

The undisputed facts here show, however, that DeVries had substantial reason to reason to doubt the veracity of Brechler's representations, and little reason to rely on those representations. First, it knew full well the market's aversion to rBST milk. Second, I also find that DeVries' admitted doubts about Brechler's credibility undermines its claim of justifiable reliance. One cannot justifiably rely, at least not in these circumstances, on assurances from someone whom one believes to be a liar. That Brechler was responsible for communicating with producers regarding produce prices is not sufficient to create a genuine issue of material fact with respect to reliance where DeVries admits that it considered Brechler a liar at the time the statements were made.

16

DeVries's alleged reliance was therefore unreasonable and unjustified as a matter of law, and cannot satisfy the elements for negligent misrepresentation in Ohio.

### D. Tortious Acts in Concert

DeVries contends that the Magistrate Judge erred in dismissing its seventh cause of action, tortious acts in concert, as to the defendant White Eagle. This claim, DeVries argues, was not before the Magistrate for decision. I agree.

White Eagle filed its motion for summary judgment before DeVries filed its first amended complaint, which included the claims for tortious acts in concert. Therefore White Eagle's motion did not encompass tortious acts in concert, and White Eagle has not subsequently moved for summary judgment on those claims.

White Eagle argues, in response to DeVries's objection to the Magistrate's report that the claims are not supported on the record and the time for discovery, amendment of claims, and dispositive motions involving White Eagle has long past. This may be so, but I decline to grant White Eagle summary judgment it did not request.

White Eagle has leave, however, to request an opportunity to submit this issue for summary consideration at the status/scheduling conference set by the Clerk.

### E. Conversion

DeVries filed no objection to the Magistrate Judge's recommendation that I dismiss its conversion claim. I adopt her opinion as my own.

17

## II. White Eagle's Defenses

### A. Waiver

The Magistrate Judge concluded that, by continuing to accept the reduced premiums, DeVries waived its right to contest the premium changes and the lack of thirty day notice. DeVries objects, arguing that the elements of waiver under Ohio law are not satisfied and the waiver issue is one of fact reserved for trial.

I have already determined that White Eagle is entitled to summary judgment on multiple issues underlying DeVries' breach of contract claim, specifically: 1) whether the 2007 premiums were fair and equitable; 2) whether DeVries was entitled to a $0.75/cwt premium; and 3) whether DeVries was entitled to thirty days' notice of any premium changes.

The only facet of DeVries' breach of contract claim that survives White Eagle's motion for summary judgment is whether the premiums White Eagle paid DeVries in 2008 were fair and equitable.

"Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory or constitutional." *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 478 (2006). Contractual terms may be waived expressly in writing or orally or impliedly by the acts and conduct of the parties. *Ohio Farmers Ins. v. Cochran*, 104 Ohio St. 427 (1922) (Syllabus ¶ 3).

 "The essential elements of a waiver are an existing right, benefit, or advantage; knowledge, actual or constructive, of the existence of such right, benefit, or advantage; and an actual intention to relinquish it or an adequate substitute for such intention." *Weaver v. Weaver*, 36 Ohio App. 3d 210, 212 (1987) (quoting 31 Corpus Juris Secundum 408 (1964)); *see also Gomez v. Huntington Trust Co.*, 2001 WL 1112690, *7-8 (N.D. Ohio).

19

A party must prove waiver by establishing a clear, unequivocal, decisive act, demonstrating the intent to waive, by the other party. *N. Olmsted v. Eliza Jennings, Inc*., 91 Ohio App.3d 173, 180 (1993) (citing *White Co. v. Canton Transp. Co.*, 131 Ohio St. 190, 198-99 (1936)). If the party having the duty to perform has changed its position as a result of the waiver, it may enforce the waiver. *Chubb v. Ohio Bureau of Workers' Comp*., 81 Ohio St. 3d 275, 279 (1998).

The Magistrate Judge found DeVries' continued performance in the face of the alleged breach to be a clear, unequivocal and decisive act demonstrating the intent to waive. DeVries objects that this leaves the other elements of waiver unaddressed. DeVries does not, however, explain why those elements are not met. Instead, it states that "[m]ost notably, the deposition of Derek DeVries establishes that as soon as DeVries Dairy realized its premiums were being reduced in 2007, White Eagle's agent Ronald Brechler was questioned about the reductions." [Doc. 66 at 5].

That DeVries elected not to terminate its membership after conversations with Brechler only weakens DeVries argument. Though Brechler offered inducements to cause DeVries to stay, DeVries "began exploring other opportunities for marketing their milk." [Doc. 30 at 10]. Based on Brechler's assurance that use of rBST would not affect DeVries' premiums, "DeVries Dairy elected to continue treating its cows with rBST and to continue its membership in White Eagle." *Id*.

 DeVries's own version of the facts shows that DeVries, believing that White Eagle had violated its rights, chose, instead of exercising its monthly option to cancel, to continue to perform on the contract. The Magistrate Judge observed that DeVries's "[c]ontinued performance under the new terms for a period of approximately 2 years is clear, unequivocal and decisive evidence that plaintiff did knowingly relinquish its right to contest the changes." [Doc. 60 at 8].

20

However, DeVries argues it cannot be found to have waived its rights to the 2008 premium reductions, because those reductions were "the genesis of DeVries's decision to terminate its membership in accordance with the membership agreement and bylaws, and ultimately prompted this litigation." [Doc. 35 at 18].

White Eagle suffered losses in the first half of 2008 and drastically reduced the DeVries' monthly premium to a negative amount. DeVries decided to terminate its contract with White Eagle. Under the terms of the bylaws and the agreement, the termination, delivered on March 28, 2008, was effective on April 30, 2008.

I find that there is a genuine issue of material fact with respect to whether DeVries intended to waive the premium changes for the first four months of 2008.

One element of waiver remains outstanding. White Eagle must show it changed its position as a result of DeVries' waiver. White Eagle asserts in a conclusory manner that it has done so, because "following the practice of non-for-profit cooperatives, the milk revenues for each monthly contract term were distributed to all White Eagle members." [Doc. 43 at 5]. White Eagle's opaque and passive voice phrasing undermines its assertion that "the discovery record clearly shows that each of the elements of waiver exist [sic]." *Id.*

> DeVries disputes White Eagle's claim that, just because White Eagle
>
> paid milk revenue to other members, that it has somehow changed its position . . . . Presumably, the cooperative pays milk proceeds to members in the regular course of business regardless of the level of premium paid to DeVries. The fact that White Eagle continued to follow its regular course of business cannot constitute a 'change in position' to connect the alleged waiver to such conduct.

[Doc. 46, at 9].

21

I find that there remains a genuine issue of material fact as to whether White Eagle changed its position due to DeVries' waiver. Accordingly, I deny White Eagle's motion for summary judgment on the basis of this affirmative defense.

### B. Agricultural Cooperative Marketing Agreement

White Eagle argues that the nature of an agricultural cooperative marketing agreement—such as that between White Eagle and DeVries—provides White Eagle with an affirmative defense. The White Eagle bylaws expressly authorize the cooperative to pool and repool the proceeds of the sales of members' milk, and losses incurred in the marketing of members' milk, in such manner as will be fair and equitable to all members. In short, because a cooperative works by marketing products collectively and distributing revenues equitably, White Eagle argues that its payments to DeVries complied fully with these terms of contract and principles of cooperative marketing.

An affirmative defense is defined as "[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true." *Saks v. Franklin Covey Co.,* 316 F.3d 337, 350 (2d Cir. 2003) (citing Black's Law Dictionary 430 (7th ed.1999)).

White Eagle does not admit the truth of DeVries's allegations, and then respond with the equivalent of "So What? Our Agreement expressly leaves you, despite the truth of everything you say, without any claim." To the extent that White Eagle wishes to argue that DeVries cannot prove that a breach of contract claim because White Eagle adhered to its agricultural marketing contract, that argument goes to an element of a breach of contract claim, namely breach.

Thus, what White Eagle labels as an "affirmative defense" is, in fact, a defense on the merits of DeVries's contract claim. But "[a] defense predicated on a plaintiff's inability to prove the

22

elements of its claim is not an affirmative defense." *Fisher v. Ciba Specialty Chemicals Corp.* 2007 WL 2995525, at *20 (S.D. Ala. Oct. 11, 2007) (citations omitted).

For this reason DeVries' motion for summary judgment is granted as to this affirmative defense; provided, however, that White Eagle will not be barred or restricted from arguing that its payments to DeVries complied fully with these terms of contract and principles of cooperative marketing agreement at trial.

### C. Failure to Mitigate Damages

White Eagle argues that DeVries failed to mitigate its damages in two ways, by: 1) failing to stop using the rBST hormone, thereby causing the Co-op to lose customers and other opportunities and increasing the its marketing costs; and 2) continuing to market milk through White Eagle during and after March, 2008, though it was given an opportunity to terminate its membership without thirty days' notice.

DeVries responds that it was under no obligation to stop using rBST in its herds, and the record shows that multiple—perhaps as many as half of the total—members continued to use rBST during the period in question.

Secondly, DeVries argues that it terminated its membership in accordance with the membership agreement—its notice of termination, sent in March, became effective thirty days later. After receiving the notice of termination, White Eagle offered DeVries the opportunity to stop shipping milk earlier than the contractually-required thirty days post-notice. Derek DeVries testified that DeVries could not have located an alternate shipper in fewer than two weeks at the earliest, but that doing so would also have hindered its ability to negotiate a competitive premium. Thus, there

23

is a genuine issue of material fact as to whether early termination would have in fact mitigated DeVries's damages.

I deny summary judgment on this affirmative defense, as there are genuine issues of material fact with respect to how quickly DeVries could have found an alternative marketer.

### III. Counterclaims

The Magistrate Judge granted DeVries' motion for summary judgment on White Eagle's counterclaims. [Docs. 30, 34 and 36]. White Eagle did not file an objection. I adopt her opinion as my own.

### Conclusion

I grant White Eagle's motion for summary judgment on DeVries' claims of breach of good faith and fair dealing, negligent representation, and conversion. I grant White Eagle's motion for summary judgment on DeVries' breach of contract claim regarding the issues of whether the 2007 premiums were fair and equitable, and whether DeVries was entitled to a $0.75/cwt premium or thirty day notice.

I grant DeVries' motion for summary judgment on White Eagle's counterclaims, and DeVries' motion for summary judgment on White Eagle's affirmative defense of agricultural cooperative marketing agreement.

DeVries' claim of breach of contract remains, but only on the narrow issues of whether: 1) the premiums it received in 2008 were fair and equitable; and 2) even if they were not fair and equitable, DeVries waived its right to contest those premiums. I do not address DeVries' claim for tortious acts in concert. White Eagle's affirmative defenses of waiver and failure to mitigate damages also survive.

24

For the foregoing reasons, it is hereby

ORDERED THAT the Report and Recommendation of the Magistrate Judge be, and the same hereby is adopted in part and denied in part:

1. White Eagle's motion for summary judgment (Doc. 28) be, and it hereby is granted as to DeVries' claims of breach of good faith and fair dealing, conversion, and negligent misrepresentation;

2. White Eagle's motion for summary judgment (Doc. 28) be, and it hereby is granted in part and denied in part as to DeVries' claim of breach of contract;

3. DeVries' motion for summary judgment on White Eagle's counterclaims (Doc. 30) be, and it hereby is granted; and

4. DeVries' motion for summary judgment on White Eagle's affirmative defenses is granted in part and denied in part.

The Clerk shall schedule a telephonic status/scheduling conference.

So ordered.


/s/James G. Carr
Sr. U.S. District Judge

25